*855 TEXTO COMPLETO DE LA SENTENCIA
El 16 de septiembre de 2006, un grupo de estudiantes del Recinto de Río Piedras de la Universidad de Puerto Rico, impidió la entrada al teatro de la institución, que se reabría tras ser remodelado. Lo hicieron en protesta porque entendían que el teatro había sido privatizado. La Rectora del Recinto, doctora Gladys Escalona de Motta, ordenó la investigación del incidente allí ocurrido. Sobre la base de esa investigación se le formuló cargos a los seis estudiantes aquí recurridos: Gerardo Ferrao Rivera, Víctor Rodríguez Márquez, Hugo Delgado Marti, Víctor J. Estrella Salas, Yaricel Rivera Morales y Gabriel Méndez Sánchez. En la carta que les envió el investigador se les informó de dos procesos: (1) el de la imputación de “conducta sujeta a acción disciplinaria”, y (2) el de “ia determinación de causa probable o motivo fundado para disponer su suspensión sumaria e inmediata como estudiante”. Este recurso se circunscribe al segundo proceso. El investigador formuló allí la querella según lo requiere el Reglamento General de Estudiantes, en su Artículo 20 A, y les convocó a la vista preliminar que presidiría como Oficial Examinador el licenciado Heriberto Sepúlveda Santiago. Celebrada la vista, el Oficial Examinador formuló sus determinaciones sobre los hechos y su recomendación. Sobre los hechos, en lo que es aquí pertinente, determinó:

*856
“Los querellados Delgado Martí, Rodríguez Márquez, Estrella Salas y Ferrao Rivera impidieron el acceso al señor Krans, bloqueándole físicamente el paso hacia las entradas del Teatro;

A la señora Aída Jiménez se le dificultó lograr acceso al interior del Teatro al ser halada y empujada por manifestantes, entre los cuales estaba la querellada Rivera Morales;

El querellado Ferrao Rivera fue uno de los que intentaban impedir que los invitados al Teatro subieran por el área de las escaleras y se expresaba en forma muy activa sobre porqué no se podía entrar al Teatro;

El querellado Méndez Sánchez tenía un papel protagónico dando órdenes de lo que se hacía allí y obstaculizó el que la señora Delia Quilinchini lograra acceso al interior del Teatro con normalidad;

La participación activa de los seis querellados, entre otros manifestantes, provocó la cancelación de la actividad artística pautada para el 16 de septiembre de 2006. ”

Al formular su recomendación, el Oficial Examinador, concluyó:

“Conforme a la totalidad de las pruebas admitidas, tanto testifical como documental, somos de parecer que la participación activa que sí tuvieron todos los querellados en la manifestación llevada a cabo en los alrededores del Teatro el 16 de septiembre de 2006, en horas de la noche, ocasionó contratiempos de tal índole que hicieron necesario la cancelación del Concierto Inaugural del Teatro; no obstante, entendemos que desde ese momento en adelante su permanencia en la Universidad en nada ha afectado el normal funcionamiento de la misma. No hemos recibido prueba tendente a establecer que las clases o actividades legítimas en la Universidad hayan sido suspendidas o afectadas en forma alguna por actuaciones posteriores, de cualquier índole, de parte de los seis querellados. En cuanto a las clases en sí, la ausencia de prueba fue total y sobre las actividades legítimas de prueba presentada ha sido a los efectos de que los querellados en forma alguna han interferido con la celebración de las mismas en fechas posteriores al 16 de septiembre de 2006. (...) De igual forma, la prueba no nos ha convencido de que la presencia de los querellados, o alguno de ellos, en el Recinto constituye un peligro inminente contra la seguridad de personas o propiedad dentro del mismo. (...) Conforme a la obligación que como Examinador nos impone el Artículo 20 en su inciso A-4 presentamos, muy respetuosamente, nuestra RECOMENDADION de que no se proceda con la suspensión sumaria de los aquí querellados y que se continúen los procedimientos ante la Junta de Disciplina correspondiente, conforme a los Artículos 14 al 17 del Reglamento General de Estudiantes. ”

La Rectora Escalona, sin embargo, decidió suspender sumariamente a los seis estudiantes. En su carta dirigida a cada uno el 19 de diciembre de 2006, les notificó:

“La evaluación objetiva de los hechos determinados por el oficial examinador establece que éstos son de tal gravedad y magnitud que constituyen una grave y seria violación de las disposiciones reglamentarias contenidas en el Reglamento General de Estudiantes de Universidad de Puerto Rico, dirigidas a posibilitar la mejor convivencia, el orden y el libre acceso y salida de facilidades universitarias. Reflejan además, una actitud en el querellado de abierto desafío e indiferencia a las autoridades académicas y administrativas a quienes válidamente se les ha encomendado la responsabilidad de asegurar la sana convivencia institucional. El informe presentado no establece justificación válida alguna para tal comportamiento. Tampoco presenta consideraciones que me permitan concluir rectificación alguna del querellado. Consecuentemente, establecen fuera de toda duda que la presencia del querellado en las facilidades impide potencialmente la celebración pacífica y ordenada de actividades legítimas en el Recinto, condición esencial para el adecuado desarrollo y desenvolvimiento de toda institución académica. Concluyó, por lo tanto, que existen motivos fundados para creer que la continuada presencia del querellado como estudiante del Recinto puede afectar, alterar e interrumpir futuras actividades, tareas académicas o administrativas en el Recinto cuando éstas no son de su 
*857
agrado. ”

También la Rectora advirtió a los seis estudiantes suspendidos de su derecho a pedirle reconsideración y de acudir en apelación ante el Presidente de la Universidad indicando los términos correspondientes. Sólo uno de los estudiantes pidió la reconsideración, la cual le fue denegada de plano y acudió en alzada al Presidente. El recurso aguarda resolución.
El 10 de enero de 2007, los estudiantes sometieron al Tribunal de Primera Instancia una “solicitud de entredicho provisional, interdicto preliminar y permanente”. Peticionaron el entredicho provisional “a los únicos efectos de que se permita participar a los estudiantes demandantes del proceso de matrícula, en lo que se celebra la vista de interdicto preliminar, sin perjuicio de que lo que en ésta se decida”. En síntesis, los estudiantes alegaron que si no se les dejaba completar el proceso de matrícula en o antes del 11 de enero, perderían su reserva de cursos. Específicamente adujeron:

“La suspensión sumaria impuesta impide que estos estudiantes se matriculen en los cursos del próximo semestre escolar, a punto de comenzar. El proceso de matrícula comienza hoy, 10 de enero, y se extiende hasta el 17 de enero y las clases comienzan en el Recinto de Río Piedras el día 18 de enero. Las fechas designadas para la matrícula de los estudiantes graduando y graduado son 10 y 11 de enero. De no lograr su matrícula, los demandantes perderán el próximo semestre académico.

Los estudiantes demandantes están en riesgo de perder su lugar en los cursos en que se inscribieron en el proceso de pre-matrícula y están en riesgo de sufrir el daño irreparable de perder, al menos, el próximo semestre académico de no expedirse el interdicto preliminar que aquí solicitamos.

Estos daños no son reparables monetariamente, puesto que resulta en la posposición de sus estudios, y en algunos casos, de culminar sus estudios, sin justificación legal que sostenga la suspensión sumaria.

Los estudiantes Víctor J. Estrella Salas, Gerardo Ferrao Rivera y Gabriel Méndez Sánchez son estudiantes en su último año de estudios de bachillerato y tienen la expectativa de completar los requisitos de graduación en el próximo año. De no emitirse la orden de interdicto preliminar, estos estudiantes están en riesgo de sufrir el daño irreparable de que su fecha de graduación sea pospuesta indefinidamente. ”
En el escrito —cuyo contenido los estudiantes refrendaron mediante sendas declaraciones juradas — , se alegan tres asuntos. El primero consiste en que la Rectora Escalona hubiese admitido en un programa de radio que su decisión de no seguir la recomendación del Oficial Examinador, se basó en el criterio que le da su conocimiento del Recinto. La demanda cita de la entrevista: “Yo lo que quiero decirle es que en este momento yo he utilizado el criterio que me da mi conocimiento del Recinto, mi conocimiento del reglamento y la información que está contenida en el informe”.
El segundo asunto se refiere a una recomendación emitida por la Junta de Disciplina en el procedimiento disciplinario como tal. El organismo recomendó a la Rectora que dejara sin efecto la suspensión sumaria hasta que se llevara a cabo el proceso de los cargos por violación a las normas de disciplina. La razón indicada fue que la suspensión requiere que el proceso de la Junta se lleve a cabo en 30 días, mientras que a los estudiantes se les dio 20 días para contestar la querella. La recomendación de la Junta se fundamenta así: “La suspensión sumaria dictada por la Rectora, el término concedido para contestar y la necesidad de que se lleve a cabo un descubrimiento de pruebas, nos lleva a concluir que la suspensión sumaria debe dejarse sin efecto para que los estudiantes tengan los términos que le fueren concedidos y oportunidad de evaluar la prueba que autoriza el Reglamento General de Estudiantes en los procedimientos disciplinarios. Nos mueve el hecho del derecho que le reconoce el Reglamento a los estudiantes a educarse. Artículo 1(A). ”
*858 El tercer asunto planteado es que la Rectora Escalona, al decidir suspender sumariamente a los estudiantes, no hizo “una declaración concisa de las determinaciones de hechos, conclusiones de derecho y las razones de política pública que justifican la decisión”, según se lo requiere el Art. 20, sección A, inciso 4 del Reglamento General.
Visto el citado escrito, el Tribunal de Primera Instancia denegó la solicitud de entredicho provisional y emitió una orden disponiendo:

“Considerada la naturaleza extraordinaria de la solicitud de injunction preliminar presentada por la parte demandante en el caso de epígrafe, el tribunal señala una vista a los únicos efectos de dilucidar la procedencia del recurso extraordinario solicitado para el 11 de enero de 2007 a las 2:00 p.m. en el salón de sesiones 904. A la referida vista, los abogados de las partes deberán comparecer preparados para lo siguiente:

1. Exponer en forma concisa y narrativa los hechos pertinentes en que descansa su razón de pedir, negar o intervenir. Todos los participantes aunarán esfuerzos para identificar los hechos medulares a la controversia.

2. Formalizar estipulaciones de hechos, anunciar la prueba testifical y documental a ofrecerse y examinar la posibilidad de acuerdo. A tal efecto, cada abogado deberá tener autorización de su representado o en su defecto éste deberá asistir ese día o estar disponible a comunicación telefónica con su abogado desde el tribunal.

3. Discutir su teoría legal.

4. La celebración de la vista evidenciaría.

Se apercibe a la parte demandada que de no comparecer a la conferencia señalada, el tribunal considerará su incomparecencia como su aceptación a los hechos alegados en la demanda y al remedio solicitado pudiendo dictar la orden de injunction preliminar sin más citarle ni oírle. (...)

A la solicitud de entredicho provisional, no ha lugar. No se estableció una razón que justifique atender la reclamación sin notificar ni escuchar a la parte demandada. (Enfasis nuestro). ”

El 11 de enero de 2007, los representantes legales de la Universidad y de la Rectora comparecieron a la vista señalada por el Tribunal. La Rectora no compareció personalmente. Los representantes argumentaron extensamente las razones por las cuales la demanda debía ser desestimada. En esencia, alegaron que los estudiantes no habían agotado los remedios administrativos establecidos por la reglamentación de la Universidad y que de sus alegaciones no surgían los elementos necesarios para la expedición de un interdicto preliminar o permanente. Hemos escuchado la regrabación de esa vista. El juez impugnado indagó sobre argumentos en torno al contenido de las declaraciones de la Rectora vertidas en el programa de radio. La representación legal requerida indicó que, por la perentoriedad del proceso, no habían tenido oportunidad de estudiarlas; que a base de las citas que se hacen en la demanda, entienden que no tienen la implicación que se les atribuye. Una vez terminaron de argumentar su solicitud de desestimación, el Tribunal de Primera Instancia concedió el interdicto preliminar solicitado, tomando como base la grabación del programa de radio que le fue sometida con la demanda. Fue entonces que los representantes de las aquí peticionarias pidieron que se celebrara vista para enfrentar la prueba, antes no habían hecho señalamiento alguno sobre el asunto. El Tribunal denegó la reconsideración allí mismo. El Tribunal, al día siguiente, emitió por escrito su orden:

“Escuchados los argumentos de las partes y considerados todos los anejos de la demanda muy en particular el “Anejo 17” consistente de una regrabación del programa radial Reacción Inmediata transmitido por Radio Isla el 20 de diciembre de 2006, determinamos que la parte demandante estableció todos los 
*859
criterios para la emisión de un injunction preliminar. Surge del “Anejo 17” que la Rectora del Recinto de Río Piedras de la Universidad de Puerto Rico, Dra. Gladys Escalona de Motta, al suspender sumariamente a los codemandantes consideró hechos que no eran parte del expediente administrativo. [La parte demandada planteó en la vista que las expresiones de la Rectora en el programa radial podían ser explicadas. Sobre este particular, cabe señalar que la Rectora no compareció a la vista.] En el programa radial antes mencionado, la Rectora dijo que utilizó para su decisión el informe del oficial examinador, sus conocimientos de la implantación del reglamento y además, su conocimiento del significado que los hechos probados que surgen del informe han tenido y que continúan teniendo en el funcionamiento del Recinto y particularmente, en el ánimo de la convivencia universitaria. ”

Primero, por haber la Rectora utilizado un medio de prueba, el conocimiento oficial, sin dar a los codemandantes la oportunidad de ser oídos en tomo a si procedía tomar conocimiento oficial de unos hechos adjudicativos, los codemandantes establecieron una posibilidad real de prevalecer en su planteamiento —[este injunction preliminar se emite al amparo de la Ley de Derechos Civiles, 32 L.P.R.A. see. 3524] — , consistente en que la Rectora violó el Art. 20 del Reglamento General de Estudiantes de la Universidad de Puerto Rico y que vulneró los principios elementales del debido proceso de ley. Véase Pagán Hernández v. U.P.R. 109 (1996). La actuación de la Rectora de tomar conocimiento oficial sin dar oportunidad a los codemandantes a oponerse, convirtió la vista celebrada por el oficial examinador en una pro forma. Se trata de un agravio de patente intensidad a un derecho que amerita urgente reparación, por lo que la reclamación de los codemandantes no está sujeta a la doctrina de agotamiento de remedios administrativos. Pierson Muller I v. Feijoó, 106 D.P.R. 838 (1978).
Segundo, los codemandantes establecieron que de no emitirse el remedio solicitado estarían en riesgo de perder el semestre académico. Asimismo concluimos que es inaceptable la sugerencia de la parte demandada de designar un tutor en caso de que los codemandantes prevalezcan en el trámite administrativo, por entender el tribunal que la experiencia del salón de clases,-donde se da una discusión de ideas, es insustituible.
Tercero, por surgir de las determinaciones de hechos del informe del oficial examinador que no desfiló evidencia alguna de que la presencia de los codemandantes en la universidad afecte las actividades legítimas de esa institución o que constituya un peligro inminente contra la seguridad de personas o propiedad dentro de la universidad, concluimos que no se afectará el interés público por la emisión del injunction preliminar solicitado.
Por todo lo antes expuesto, el tribunal emite un injunction preliminar y le ordena a la parte demandada permitir a los codemandantes participar del proceso de matrícula y asistir a clases hasta tanto la controversia se resuelva en los méritos. Cada uno de los codemandantes debe prestar una fianza por $100. El tribunal le apercibe a los codemandantes que dejará sin efecto este injunction preliminar si la parte demandada establece que éstos están retrasando caprichosa e injustificadamente el trámite administrativo.
Por último, cabe aclarar que por el remedio concedido ser uno de naturaleza preliminar, el tribunal no ha declarado inválida la decisión de la Rectora. Solamente estamos paralizando la suspensión sumaria. Los codemandantes deben agotar los remedios administrativos; en específico, la apelación de la suspensión sumaria al Presidente de la U.P.R.
Inconforme, las demandadas peticionarias recurren en certiorari ante nosotros con lo siguientes señalamientos de error:

“Erró el Tribunal de Primera Instancia al conceder el injunction preliminar sin celebrar una vista evidenciaría.

Erró el Tribunal de Primera Instancia al negarle a la Universidad la oportunidad de ser oída y de 
*860
confrontar la prueba que utilizó para tomar su determinación a los efectos de conceder el injunction preliminar, en clara contravención a los postulados básicos del debido proceso de ley.

Erró el Tribunal de Primera Instancia al resolver que la Rectora violó el Artículo 20 del Reglamento General de Estudiantes y el debido procedimiento de ley de los demandantes al considerar hechos que no son parte del expediente administrativo de los cuales alegadamente tomó “conocimiento oficial”, sin darle a los demandantes oportunidad de ser oídos con respecto a si procedía tomar tal conocimiento oficial.

Erró el Tribunal de Primera Instancia al no desestimar la Demanda, pues los Demandantes-Recurridos no agotaron los remedios administrativos correspondientes, establecidos en los reglamentos de la Universidad.

Erró el Tribunal de Primera Instancia al revisar la corrección de la decisión de la Rectora de suspender sumariamente a los Recurridos, pues dicho Tribunal no tenía jurisdicción para hacerlo y, en adición, no aplicó los principios de deferencia a la pericia administrativa requeridos por nuestro ordenamiento.

Erró el Tribunal de Primera Instancia al dictar el injunction preliminar sin que los demandantes recurridos hubiesen alegado o probado los elementos necesarios para su expedición. ”

Debemos, de entrada, hacer ciertas aclaraciones que dan contexto a este recurso. En primer lugar, tenemos que estar conscientes de que para que se pueda emitir una orden de interdicto preliminar o permanente en este tipo de caso, hay que superar dos estándares de gran exigencia. El primero lo estableció el Tribunal Supremo en A.P.P.R. v. Tribunal Superior, 103 D.P.R. 903, 906 (1975):
“El injunction, que desde su temprana etapa de entredicho está concediendo un remedio que en el procedimiento usual ordinario no se alcanza hasta vencer en juicio, debe expedirse con sobriedad y sólo ante una demostración de clara e intensa violación de un derecho. La orden de entredicho, como todo remedio provisional dirigido a asegurar la efectividad de sentencia, ha de pasar por el exigente tamiz de discreción judicial que ha de ejercitarse en cuidadosa ponderación del interés de todas las partes, y con mayor rigor cuando una de éstas no ha sido oída antes de librar la orden. Esta norma de moderación en el uso del injunction tiene su máxima aplicación cuando su efecto restrictivo ha de operar sobre una agencia u organismo de servicio público con grave impacto y erosión del derecho de las numerosas personas, del pueblo en general, a quien sirve la corporación pública. ” (Enfasis nuestro).
El segundo estándar lo estableció el Tribunal Supremo en Sonic Knitting Industries v. I.L.G.W.U., 106 D.P. R. 552, 556 (1977):
“El recurso de injunction, para impedir que se prive a una persona de algún derecho, privilegio o inmunidad protegido por la Constitución o las Leyes del Estado Libre Asociado de Puerto Rico y por la constitución o Leyes de los Estado Unidos de América aplicables a las personas que estén bajo la jurisdicción del Estado Libre Asociado de Puerto Rico, autorizado por Ley Núm. 12, Parte 2, de 8 de agosto de 1974, pág. 667 (32 L.P.R.A. see. 3524), no ha desplazado ni es substituto del procedimiento de apelación y revisión de decisiones en la esfera administrativa. Tampoco está supeditado a normas de jurisdicción primaria y agotamiento de la vía administrativa. Su posición, más bien que de competencia, es la de coexistencia con aquéllos y otros remedios. Pero su naturaleza es la de recurso legal extraordinario a utilizarse cuando el procedimiento ordinario no provea un remedio rápido, adecuado y eficaz, para corrección de un agravio de patente intensidad al derecho del individuo que reclame urgente reparación. Este injunction provisto para la pronta vindicación de derechos fundamentales, es recurso privilegiado tan eficaz en su acción como exigente en la claridad y valía del derecho reclamado. ” (Énfasis nuestro).
La primera aclaración que hacemos es que este recurso —que impugna la validez de un interdicto *861 preliminar — , nos ha llevado a concluir, de modo provisional —en lo que se examina la prueba en un juicio en su fondo — , que es probable que la demanda interpuesta supere los citados estándares. Esto justifica que se otorgue un interdicto preliminar para mantener el estado de cosas en lo que se dilucida con más ponderación y enjuicio de adversarios, el asunto.
La segunda aclaración que hacemos es que el interdicto preliminar emitido atiende sólo uno de dos estados de cosas que fueron reclamados. Atiende el reclamo de que se dejara sin efecto la suspensión sumaria de forma que los estudiantes pudieran hacer su matrícula y comenzar a asistir a clases. Ese evento debe haber ocurrido. Los estudiantes deben haber comenzado sus clases. Pero pueden ser suspendidos aun, si se concluyese, una vez se complete este litigio, que procede la suspensión sumaria efectuada.
La tercera aclaración es que el recurso plantea tres cuestiones que hemos de responder primero para dar marco a la consideración específica de los señalamientos de error. Estas son: (1) si procede el interdicto preliminar sin la vista previa solicitada sobre la evidencia considerada para expedirlo, (2) si en este caso se requería agotar el remedio administrativo, y (3) si el remedio otorgado es suficiente. Después de analizarlas habremos de abordar, a manera de síntesis, cada uno de los señalamientos de error.

1. ¿Procede el interdicto preliminar sin la vista previa solicitada?

En Mun. de Loíza v. Sucns. Suárez, et al, 154 D.P.R. 333, 366 (2001), el Tribunal Supremo compendió su doctrina sobre el interdicto. Es ésta:
El injunction es, por naturaleza, dinámico: "se caracteriza por su perentoriedad, por su acción dirigida a evitar un daño inminente o a restablecer el régimen de ley conculcado por conducta opresiva, ilegal o violenta del trasgresor del orden jurídico." A su vez, el injunction es un “remedio dinámico sobre el cual los tribunales siempre conservan jurisdicción para dejarlo sin efecto o modificarlo a favor o en contra del que resulta obligado”. (...) Este tribunal ha establecido que los criterios que se deben tomar en cuenta al decidir si concede o no un remedio provisional de injunction son: "la naturaleza de los daños que pueden ocasionárseles a las partes de concederse o denegarse el injunction; su irreparabilidad o la existencia de un remedio adecuado en ley; la probabilidad de que la parte promovente prevalezca eventualmente al resolverse el litigio en su fondo; la probabilidad de que la causa se torne en académica de no concederse el injunction y, sobre todo, el posible impacto sobre el interés público del remedio que se solicita." (...) "El injunction permanente también requiere la celebración de vista y la consideración de la mayor parte de estos criterios. (...) Precisa conceder una petición de injunction permanente si la parte que lo solicita demuestra que no tiene ningún otro remedio en ley para evitar un daño: “Procede un injunction para evitar daños irreparables o una multiplicidad de procedimientos. [Citas omitidas.] El concepto de evitación de daños irreparables o de una multiplicidad de procedimientos constituye un aspecto de la regla básica de que procede un injunction cuando el remedio existente en el curso ordinario de la ley es inadecuado.” [Hemos omitido las citas de la abundante jurisprudencia reiterada]
En este caso debemos determinar primero la naturaleza del daño que pueda ocasionarse a las partes de concederse o denegarse el injunction. El Tribunal Supremo de Puerto Rico definió en Pagán Hernández v. U.P.R., 107 D.P.R. 720, 737 (1978), la naturaleza del derecho al debido proceso de ley “con respecto a su aplicación a estudiantes universitarios”. Lo basó en el derecho a la educación consagrado en el Art. II, Sec. 5 de la Carta de Derechos de nuestra Constitución, Art. II, Sec. 5, Const. E.L.A. L.P.R.A., Tomo 1, que dispone: “Toda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales”. Allí mismo, en nota al calce, se incorpora una cita de don Pedro Muñoz Amato, de gratísima recordación: “Entre los nuevos derechos que en el siglo XX forman parte fundamental del liberalismo democrático, el de obtener educación equivale consubstancialmente a la libertad, que no es meramente la ausencia de restricciones externas, sino la manifestación positiva de las potencialidades humanas. La educación es el cultivo de la personalidad para *862 expresar de ella lo más humano en su mejor realización posible”. El Tribunal Supremo, a la página 739 y siguientes, tomó nota de los desarrollos de la doctrina federal de Estados Unidos en la materia y pautó su recepción en nuestra doctrina constitucional:
“Veamos cómo se ha desarrollado la doctrina sobre debido proceso de ley en los últimos años con respecto a su aplicación a estudiantes universitarios. Como cuestión de tradición, las universidades gozaban de una gran autonomía en cuestiones pertinentes a la admisión y la disciplina de sus estudiantes. (...) La razón de ser de esta autonomía era que se consideraba a las universidades las expertas en su campo, por lo que no debían estar sujetas a revisión judicial. (...) Los tribunales entendían que la relación entre el estudiante y la universidad era única y particular y que solamente la universidad contaba con la experiencia y la sensibilidad necesarias para reglamentar la admisión y las suspensiones, expulsiones y otros trámites disciplinarios de estudiantes, para así asegurar una atmósfera adecuada de enseñanza. (...) En cuanto a las universidades públicas, los tribunales estatales consideraban que la universidad tenía el poder discrecional para establecer la reglamentación que considerase necesaria. (...) Los tribunales no intervendrían excepto en casos en que la universidad actuase en una forma irrazonable. (...) Las cortes federales consideraban que la educación superior es un privilegio concedido por el Estado, no protegido por la Enmienda XIV. (...) El resultado práctico de estas doctrinas era que los tribunales reconocían a las universidades un poder casi absoluto y sólo intervenían si la expulsión del estudiante era arbitraria o irrazonable. (...) No había que celebrar una vista para suspender o expulsar a un estudiante (...). Tal era la doctrina mayoritaria antes de la década del sesenta, hasta el caso de Dixon v. Alabama State Board of Education, 294 F. 2d 150 (1961), cert. Denegado, 368 U.S. 930 (1961). (...) Esta decisión extendió a los estudiantes de universidades públicas las cláusulas del debido proceso de ley y de igual protección de las leyes contenidas en la Enmienda XIV. Determinó que el debido proceso de ley requiere notificación, con especificación de cargos, y oportunidad de vista antes de decretarse la expulsión de un estudiante por conducta indebida.” [Hemos omitido citas y partes impertinentes]
En Maldonado Elías v. González Rivera, 118 D.P.R. 260, 273 (1987), con base en el citado precedente seminal de Pagán Hernández, el Tribunal Supremo celebró el destierro de la dicotomía de privilegios-derechos en nuestra jurisdicción.
En el caso ante nuestra consideración se alegó que a cada uno de los seis estudiantes suspendidos se le causaría el daño de privarle del derecho a la educación universitaria, al menos por un semestre, si no se les permitía matricularse antes del 11 de enero de 2007. La naturaleza del daño es proporcional a la naturaleza del derecho, el cual —como hemos visto — , es uno de naturaleza constitucional sustancial. Resolvemos que no permitir la matrícula de los estudiantes en este caso, podría constituir “un agravio de patente intensidad al derecho del individuo” que reclama “urgente reparación” a la luz de la Ley de Derechos Civiles, 32 L.P.R.A. 3524, citada por el Tribunal de Primera Instancia en su orden aquí impugnada. Esto es así porque se interrumpe la educación de los estudiantes sin que se haya completado aún el proceso disciplinario en su contra. Veremos —al considerar el tercer requisito para expedir un interdicto — , que es posible que se determine al final de este proceso que no se ha cumplido con un requisito constitucional para la suspensión sumaria decretada. La definición de la naturaleza del daño que aquí hacemos es de dimensión constitucional y “no está supeditada a normas de jurisdicción primaria ni agotamiento de la vía administrativa”. Pierson Muller v. Feijoó, 106 D.P.R. 838, 850 (1978).
Nos corresponde examinar, en segundo lugar, la irreparabilidad del daño o la existencia de un remedio adecuado en ley. Plantearon los estudiantes, con el fin de justificar la urgencia del interdicto preliminar, que el no matricularse antes del 11 de enero de 2007 tenía por consecuencia que se le cancelara la reserva de cursos que habían hecho. Esto les hubiese dificultado, más adelante en el semestre, incorporarse a cursos de los de su programa en particular. La médula del planteamiento de la Universidad es que hay un procedimiento administrativo reglamentario por agotar, que es el de la apelación ante el Presidente. Pero sabemos que uno de los estudiantes pidió la reconsideración y está pendiente su apelación aún después del 11 de enero de 2007. Es *863 obvio que ese remedio no es adecuado en ley para lograr que los estudiantes se matriculen a tiempo y lleguen a sus clases el 18 de enero de 2007. Planteó además la Universidad durante la vista, que los estudiantes podían matricularse tarde y que se les podría ofrecer tutorías para que el daño no fuera irreparable. El planteamiento del derecho a la educación no puede ser despachado tan ligeramente. Véase Pagán Hernández, supra, a la página 738. El derecho a la educación definido en nuestra Constitución no admite parches. Eso no propende al más pleno desarrollo personal al que nuestra carta magna aspira.
En tercer lugar debemos examinar la probabilidad de que la parte promovente prevalezca eventualmente al resolverse el litigio en su fondo. En este caso, el Tribunal de Primera Instancia consideró, preliminarmente, que las declaraciones vertidas por la Rectora Escalona en un programa de radio, podrían demostrar que ella tomó conocimiento oficial de hechos sin dar oportunidad a los estudiantes a confrontarse con la calidad del conocimiento, según lo requiere la jurisprudencia y el derecho probatorio. Hemos leído las declaraciones de la Rectora. Concluimos que la inferencia hecha por el Tribunal de Primera Instancia va más allá de las palabras específicas utilizadas. Pero no acogemos el planteamiento de la Universidad que indica que para hacer esa inferencia, el juzgador tenía que primero admitir la evidencia luego de autenticarla y después permitir a la Rectora explicar sus declaraciones. Explicó David Rivé Rivera, en su clásico ensayo El injunction en Puerto Rico, 53 Rev. Jur. U.P.R. 341, 349 (1984):

“La vista sobre el injunction preliminar no es una vista en los méritos. Es una en la que se discute una moción interlocutoria. Por lo tanto, en ellas, las partes pueden presentar pruebas sin tener que atenerse a los requisitos de las reglas de evidencia. Se admiten declaraciones juradas, deposiciones y cualquier otra prueba documental que, aunque resultaría inadmisible en el juicio, puede llevar al tribunal a determinar que el peticionario tiene derecho al remedio que reclama. Si el demandado no cuestiona la exposición de hechos que presenta el demandante, o si no solicita una vista evidenciaría, se corre el riesgo de que el tribunal de por admitidos todos los hechos según relatados por el solicitante, y expida el auto mediante sentencia sumaria, o sentencia por las alegaciones. Por lo tanto, el peso de cuestionar la veracidad de los hechos expuestos por el demandante en su petición le incumbe al demandado. ”

En este caso, el juez recurrido ordenó a las demandadas a tiempo durante la vista del interdicto preliminar, que se expresaran sobre la prueba sometida, específicamente sobre la grabación. No la objetaron ni pidieron la vista evidenciaría entonces. Cuando el tribunal recurrido otorgó el interdicto preliminar, fue que pidieron vista evidenciaría. Sobre la doctrina del derecho procesal federal que otorga amplia discreción a los tribunales para conceder un interdicto provisional sin vista evidenciaría, cuando no se plantean controversias de hechos, como sucedió en este caso, véase Wrights, Miller & Kane, Federal Practice and Procedure, Civil II, sec. 2949.
Al leer las declaraciones de la Rectora, observamos que ella no fue más allá de invocar su experiencia como académica al interpretar los hechos escuchados y dirimidos por el Oficial Examinador. No se trata pues de tomar conocimiento oficial de hechos distintos de los escuchados por él, sino de interpretar esos hechos a la luz de la experiencia adquirida por la Rectora en el manejo de la disciplina institucional. Pero su fallo fue otro. El Oficial Examinador, al emitir sus determinaciones sobre los hechos y su recomendación, explicitó los criterios del Reglamento en los que se basaba: “El Rector de un Recinto, el Director de un colegio Universitario o Regional o el funcionario en quien los mismo deleguen, previa determinación de que existen motivos fundados para creer que la presencia de algún estudiante en las facilidades de la Universidad, bajo su jurisdicción, impide la celebración pacífica y ordenada de clases u otras actividades legítimas o constituye un peligro inminente contra la seguridad de personas o propiedad dentro del mismo, podrá suspender a tal estudiante conforme al siguiente procedimiento: ...”. Sobre la base de esos criterios concluyó: (1) que no desfiló ante él prueba de que los estudiantes interrumpieran más actividades en el Recinto después del 16 de septiembre de 2006, y (2) que tampoco desfiló prueba de que los estudiantes constituyan un peligro para la Universidad.
La Rectora, al no seguir la recomendación recibida, se limitó a interpretar los mismos hechos a la luz de los *864 criterios que le aporta su experiencia, pero no explicitó esos criterios. Hay un vacío en su carta de suspensión sumaria sobre el criterio específico a la luz del cual ella dirimió los hechos de otra manera. El Art. 20, sección A, inciso 4 del Reglamento General de la Universidad, le requiere “una declaración concisa de las determinaciones de hechos, conclusiones de derecho y las razones de política pública que justifican la decisión”.
La Rectora debió considerar que existen criterios obligatorios de carácter constitucional para informar las decisiones del liderato universitario en estos casos. En Sánchez Carambot v. Dir. Col. Univ. Humacao, 113 D.P.R. 153, 163 (1982), el Tribunal Supremo se enfrentó al choque entre el derecho de expresión de los estudiantes universitarios para hacer protestas y el deber de las autoridades de evitar que el ejercicio de esos derechos alteren o interrumpan las actividades docentes. Pautó el Tribunal Supremo:
“En la doctrina de derecho constitucional americano, tan similar al nuestro en aspectos que se refieren a derechos fundamentales, R.C.A. v. Gobierno de la Capital, 91 D.P.R. 416, 427 (1964), se ha considerado seria y profundamente si un trasfondo de violencia es válido para justificar una intervención de las autoridades públicas con los derechos de expresión y asociación del ciudadano. La respuesta ha sido afirmativa, considerándose, como es natural, que experiencias anteriores de actos violentos pueden poner restricciones a los derechos de ciertas personas u organizaciones de llevar a cabo mítines, marchas y reuniones, todo ello con ánimo de proteger la vida y propiedad de los ciudadanos. (...) No obstante, considerando las serias repercusiones que tal censura conlleva, deben coincidir varios requisitos para que esa restricción justificada con actos violentos previos sea válida. En primer lugar, la violencia debe ser lo bastante seria como para causar, bien lesiones personales de envergadura o daño sustancial a la propiedad. Además la violencia debe ocurrir en la misma área en que se pretende llevar a cabo la demostración, porque un cambio de ubicación, por lo común, rompe con el patrón de violencia y altera las variables importantes, tales como los objetivos simbólicos, las víctimas potenciales, los incitadores posibles y los escondites usuales. Más aún, la violencia debe ser lo suficientemente continua como para constituir un patrón o trasfondo verdadero y no un mero acto desafortunado del pasado. Por último, la violencia debe ser reciente. Como se dijo en Drivers Union v. Meadowmoor, 312 U.S. 287, 294 (1941), debe haber un “momentum de temor”, una “intimidación continua”, pág. 298. V. Blasi, Prior Restraints on Demonstrations, 68 Mich. L. Rev. 1481, 1520 et seq. (1970). Podemos resumir, que la violencia anterior que da lugar a la restricción válida del ejercicio de libertades de expresión y asociación de grupos, debe ser de sustancial magnitud y continuidad y debe ocurrir aproximadamente en el mismo lugar en que ahora se proscribe, así como en tiempo reciente. ” (Énfasis nuestro)
Nótese que la recomendación del Oficial Examinador, aunque no la cita, coincide con esa pauta normativa. El jurista buscó y no halló la prueba de la continuidad de la violencia. Si la conclusión de la Rectora es que los hechos ya probados ante el examinador eran suficientemente violentos, su experiencia no basta para justificar el apartarse del requisito constitucional de continuidad. La ausencia de determinaciones al respecto nos lleva a concluir que por esta razón los estudiantes aquí recurridos podrían prevalecer al resolverse el interdicto solicitado.
En cuarto lugar debemos examinar la probabilidad de que la causa de acción se torne académica de no concederse el interdicto preliminar. Los estudiantes alegaron bajo juramento en su demanda que, de no haberse matriculado antes del 11 de enero de 2007, se hubiese cancelado la reserva de sus cursos y quedaban a riesgo de perder el semestre y retrasar su graduación. Eso basta para determinar que el no conceder el remedio interdictal provisional hubiese tomado académica la demanda. Ya los estudiantes están matriculados y pueden asistir a sus clases. Pero falta aún determinar si la suspensión sumaria se restablece una vez se vea esta demanda en la vista en su fondo del interdicto permanente.
Eso nos lleva al último criterio para otorgar el interdicto preliminar: el posible impacto sobre el interés *865 público del remedio que se solicita. El interés público más urgente que la Rectora tomó en consideración es salvaguardar la marcha normal de las actividades tanto docentes como universitarias en general frente a posibles actos de interrupción o alteración, como los que fueron probados ante el Oficial Examinador. En el caso ante nuestra consideración, el interdicto provisional no está reñido con ese interés público. Como reiteró el Tribunal Supremo en Mun. de Loíza v. Sucns. Suárez, supra, el interdicto, y más el preliminar, es “remedio dinámico sobre el cual los tribunales siempre conservan jurisdicción para dejarlo sin efecto o modificarlo a favor o en contra del que resulta obligado". Un tribunal puede, en su orden, tomar medidas cautelares, como la de apercibir que se dejará sin efecto el interdicto y se restablecerá la suspensión sumaria de los demandantes en caso que incurran en actos que impidan “la celebración de clases u otras actividades legítimas o constituyan un inminente peligro para la seguridad’ en el Recinto, cf. Art. 20 del Reglamento General. Basta tomar en consideración los criterios citados de Sánchez Carambot.

2. ¿Se requería agotar el remedio administrativo?

La Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A., see. 2173, dispone:
“El Tribunal podrá relevar a un peticionario de tener que agotar alguno o todos los remedios administrativos provistos en el caso de que dicho remedio sea inadecuado, o cuando el requerir su agotamiento resultare en un daño irreparable al promovente y en el balance de intereses no se justifica agotar dichos remedios, o cuando se alegue la violación sustancial de derechos constitucionales,
En este caso hay, como establecimos al principio, dos procesos administrativos distintos. Al considerar si hay que agotar un remedio administrativo, nos referimos al que apelaría la suspensión sumaria. Al análisis que ya hemos hecho sobre este mismo asunto sólo le falta añadir un elemento: el balance de intereses. En este caso existe, de una parte, el interés de los estudiantes de continuar sus estudios mientras enfrentan el proceso que se sigue contra ellos, presumida su inocencia. De la otra parte, está el interés de la Universidad y de la Rectora de mantener la buena marcha del Recinto en todas sus actividades docentes y universitarias en general, así como de poner en vigor las normas de disciplina vigentes.
La Universidad tiene sometidos a los seis estudiantes a un proceso de disciplina que, según la Junta que lo preside, ha de llevarse a cabo con plenas garantías para ellos. Tomamos conocimiento de que “la Universidad concede y se allana a la premisa de que su discreción —independientemente de la naturaleza del derecho envuelto — , tiene que ejercitarse conforme a criterios constitucionales.” García Cabán v. U.P.R., 120 D.P.R. 167, 175 (1987). Mientras tanto, la Rectora ha dictaminado la suspensión sumaria de los estudiantes para salvaguardar el interés institucional.
Sabemos que exigir que se agoten los procesos administrativos de reconsideración ante la Rectora y de apelación ante el Presidente y la Junta de Síndicos, desatiende el derecho fundamental de los demandantes y recurridos que hemos aquí definido. Uno de los estudiantes lo hizo y se le denegó de plano. Falta aún la apelación ante el Presidente, luego ante la Junta de Síndicos y luego la revisión judicial. Cuando eso termine, si la solución les fuera favorable, el daño estaría varias veces multiplicado. La pregunta que falta por responder es si la Universidad y la Rectora, en aras de su interés de asegurar que no se interrumpan más las actividades docentes y universitarias, no pueden prescindir de la suspensión sumaria decretada; tanto así que el Tribunal de Primera Instancia deba exigir que se agote el procedimiento administrativo. Resolvemos que no, al contrario.
La matrícula de los estudiantes y su asistencia a clases no hacen sino comprobar el respeto de la Universidad por los derechos constitucionales. Es éste un modo muy efectivo de educar sobre los valores de nuestro Estado de Derecho. En vista de lo inadecuado del remedio administrativo en la atención de los intereses de los estudiantes, el balance de los intereses requiere que, antes de agotar el remedio administrativo, se congele el estado de cosas. Es decir, requiere que provisionalmente se matricule a los estudiantes, se les permita asistir a *866 clases y, cuanto antes, se dilucide el interdicto permanente, luego de la vista evidenciarla.

3. El remedio otorgado, ¿es suficiente?

El Tribunal de Primera Instancia en su orden apercibió a los estudiantes demandantes de que la dejaría sin efecto “si retrasaran caprichosa e injustificadamente el trámite administrativo.” Es una forma de impedir que los estudiantes usen tácticas dilatorias para terminar sus estudios y hacer académico el proceso disciplinario que se sigue en su contra. Falta apercibirles que se dejará sin efecto el interdicto preliminar si incurriesen en conducta similar a la que el Oficial Examinador halló probada.
Como aclaró el Tribunal Supremo en Mun. de Ponce v. Gobernador, 138 D.P.R. 431, 436, “el hecho de que se haya dictado un injunction preliminar (...) en modo alguno adjudica ni prejuzga la controversia, ni siquiera una parte de ella.” Nosotros hemos pasado juicio sobre la validez del interdicto preliminar. “El tribunal de instancia —añadió Mun. de Ponce v. Gobernador, a la página 437—, resolverá la controversia independientemente de la medida provisional”. En vista de los intereses de ambas partes, el Tribunal de Primera Instancia deberá adelantar el proceso para dilucidar el interdicto permanente en un calendario acelerado, independientemente de la medida provisional.
En este recurso se señaló como error que se concediera el interdicto preliminar sin celebrar una vista evidenciaría. Hemos visto que el error no se cometió. Se señaló como error que el Tribunal tomara como prueba la grabación del programa de radio sin escuchar primero el testimonio de la Rectora, en violación del debido proceso de ley. La ausencia de la Rectora en la sala, habiéndosele citado y la ausencia de un planteamiento oportuno de las demandadas -cuando el juez se lo solicitó-, es suficiente razón para tomar en consideración la evidencia en la etapa de un interdicto preliminar, aunque resulte después inadmisible en el juicio en su fondo. El error no se cometió. Se señaló como error que se tomara por “conocimiento oficial” el que usó la Rectora para no seguir la recomendación del Oficial Examinador. Hemos visto que, como cuestión de interpretación -para lo cual estamos en la misma posición que el juzgador de instancia-, el error se cometió; pero también vimos que hay razones que indican que el interdicto preliminar puede prevalecer. Se señaló como error que no se agotaran los remedios administrativos. Hemos visto que por la calidad del derecho civil a la educación y el daño irreparable inminente, no había que hacerlo; que tampoco lo requería el balance de los intereses. Se señaló como error que se revisara la corrección de la decisión de la Rectora sin jurisdicción y sin otorgarle la deferencia debida. Hemos visto que en este caso hay jurisdicción para otorgar el remedio interdictal, por tratarse de una demanda para la “vindicación de derechos fundamentales" que es un “recurso privilegiado”, A.P.P.R. v. Tribunal Supremo, supra. Hemos visto también que no se ha pasado juicio sobre la actuación de la Rectora excepto para cumplir con -el requisito de determinar “la probabilidad de que la parte promovente prevalezca eventualmente al resolverse el litigio en su fondo." Se señaló como error que los demandantes no hayan probado los elementos para que se expida el interdicto. Hemos visto que, preliminarmente, sí lo hicieron.
En virtud de lo expuesto, se expide el auto, se modifica la orden de interdicto preliminar emitida al único efecto de advertir a los demandantes que ésta se dejará sin efecto si incurriesen en conducta similar a la que el Oficial Examinador halló probada, según los criterios de Sánchez Carambot, supra, y así modificada se confirma. Además se instruye al tribunal de instancia que le de trámite acelerado a la dilucidación del interdicto permanente. A la moción en auxilio de jurisdicción, no ha lugar.
Notifíquese inmediatamente vía fax o teléfono y del modo ordinario.
Lo acordó el Tribunal y lo certifica la Secretaria.
Mildred Ivonne Rodríguez Rivera
Secretaria Interina del Tribunal de Apelaciones